UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JPS ELASTOMERICS CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.:_____ |
| SPECIALIZED TECHNOLOGY | ) | |
| RESOURCES, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

Plaintiff JPS Elastomerics Corp. ("JPS"), by its attorneys, for its Complaint against Specialized Technology Resources, Inc. ("STR") to recover in antitrust and other injuries, alleges, upon personal knowledge, publicly available information, detailed investigation by counsel, and upon information and belief with respect to all other matters, as follows:

### Nature of Action

This is an action in which Defendant STR, already a monopolist in the fast-growing market for producing a low-shrink plastic polymer, namely, ethyl vinyl acetate ("EVA"), for encapsulation of photovoltaic solar modules, falsely claimed a trade secret in a technology for producing low-shrink EVA, and used that false claim, along with other anti-competitive conduct, including exclusionary multi-year "take-or-pay" contracts, to maintain and enhance its monopoly by driving Plaintiff JPS, a growing competitive threat to STR's market dominance, out of the market. STR engaged in false claims and sham litigation by filing and pursuing litigation in Massachusetts Superior

Court against JPS in which STR claimed that the technology was its trade secret.  Instead, JPS subsequently learned that STR's equipment manufacturer, at about the same time that STR commenced suit against JPS in 2007, publicly was offering for sale and promoting equipment for making STR's claimed trade secret to customers throughout Asia and at major industry trade shows throughout the world.  Notwithstanding this public information, STR continues to engage in an illegal anticompetitive overall scheme to maintain and enhance its monopoly by excluding JPS from the market for low-shrink EVA encapsulants.  Specifically, STR does this by maintaining its sham litigation, employing exclusionary contracts with its customers to bar or limit new entrants, in having sought what effectively was an unreasonable and anticompetitive license precluding JPS from producing EVA encapsulants even by methods not comprised of any components of STR's purported trade secret, blocking JPS from purchasing other technologies available to manufacture low-shrink EVA that are publicly available and currently for sale, barring JPS' access to some materials suppliers, and disparaging JPS within the photovoltaic industry for the purpose of driving away its potential customers and suppliers.  Each of these components of STR's overall anticompetitive and exclusionary conduct arises from STR's subjective and bad-faith intent to prevent, impede, or delay JPS' entry into the relevant market.

As a result of the injury caused to it by STR's illegal conduct, JPS seeks the following relief: compensatory damages of $60,000,000, with actual damages to be established at trial; treble its compensatory damages under the automatic trebling provisions of the Sherman Antitrust Act; its attorneys' fees for the defense of STR's sham litigation and JPS' prosecution of this action; and a permanent injunction against

STR's anticompetitive conduct including its use of exclusionary multi-year "take-or-pay" contracts.

## The Parties

1.    Plaintiff JPS is a Delaware corporation with its principal office located at 412 Main Street, Easthampton, Massachusetts.  Through its Stevens Urethane division, JPS manufactures extruded urethanes, polypropylenes, and EVA resins for specialty industrial applications, including a number of lines of EVA photovoltaic encapsulant for use in solar modules.

2.    Defendant STR is a Delaware corporation with its principal office located at 10 Water Street, Enfield, Connecticut and an office located at 85 John Road, Canton, Massachusetts.  STR is a self-proclaimed "leading global provider of encapsulants to the solar module industry," including low-shrink EVA photovoltaic encapsulants.

## Jurisdiction And Venue

3.    The Court has subject matter jurisdiction over JPS' Sherman Act (15 U.S.C. § 2) and Lanham Act (15 U.S.C. § 1125) claims pursuant to 28 U.S.C. §§ 1331, 1337(a).  Jurisdiction over JPS' state law claims is proper under 28 U.S.C. § 1367 and the principles of supplemental jurisdiction.

4.    Venue is appropriate in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b), 28 U.S.C. § 1392, 15 U.S.C. §§ 15 and 22.  Defendant STR transacts business within this district, has an office location within this district, has a registered agent for service of process in Massachusetts, and a substantial part of the events giving rise to the claims were intended to cause effects in this district.

5.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1332, in that this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interests.

6.      Defendant STR is subject to personal jurisdiction because it conducts business in this state and availed itself of this state's jurisdiction.

## Interstate Trade And Commerce

7.      STR manufactures and sells substantial amounts of low-shrink EVA photovoltaic encapsulants in a continuous and uninterrupted flow of commerce across state lines throughout the United States and internationally.

8.      At all material times, low-shrink EVA photovoltaic encapsulants were manufactured and sold by STR and shipped across state and national lines and sold to customers located outside STR's state of manufacture.

9.      At all material times, STR participated in the transmittal of funds, as well as contracts, invoices, and other forms of business communications and transactions, in a continuous and uninterrupted flow of commerce across state and national lines in connection with the sale of low-shrink EVA photovoltaic encapsulants.

10.     In furtherance of its efforts to obtain willfully and/or maintain monopoly power over the market for low-shrink EVA photovoltaic encapsulants, STR employed the United States mail and interstate and international telephone lines, as well as means of interstate and international travel.

11.     STR's efforts willfully to obtain and/or maintain monopoly power over the market for low-shrink EVA photovoltaic encapsulants, as alleged herein, has substantially affected interstate and foreign commerce.

# I.    Relevant Market

## A.    The Relevant Product Market

12.    The relevant product market is low-shrink EVA encapsulants.

13.    The most prevalent technology used to generate electricity from sunlight is a system of interconnected photovoltaic ("PV") cells.  PV cells are semiconductor devices that convert sunlight into electricity.  A series of PV cells are electronically interconnected and then laminated and framed, that is, encapsulated, in a durable and weatherproof package known as a solar module.  Materials used in the encapsulating process are known as encapsulants and are critical to the proper functioning of solar modules, as they protect the PV cells from the elements, bond the multiple layers of the module together, and provide electrical insulation.  Low-shrink EVA is a polymeric sheeting material used to encapsulate PV solar modules.

14.    PV modules are one of the fastest growing renewable energy technologies.

15.    PV solar cells can be manufactured using two different semiconductor materials: crystalline silicon cells and thin-film cells.  For both of these major categories of PV solar cells, the core component is the semiconductor circuit.  Encapsulants are needed to encapsulate PV solar cells, whether they are comprised of crystalline silicon or thin-film.

16.    Ninety percent (90%) or more of all PV modules are manufactured using an EVA-based encapsulant.  *See, e.g.*, Chris Warren, FOILED AGAIN, *Photon International*, September 2009 at 300, 309.  Other encapsulants, including PVB (polyvinyl butyral), aliphatic TPU (thermoplastic polyurethane), ionomers, and silicones play a lesser role.  Crystalline silicon PV modules are predominantly constructed using an

EVA-based encapsulant.   Within the thin-film PV module market, an EVA-based encapsulant is the leading encapsulant, followed by PVB.   On information and belief, EVA-based encapsulants have approximately an eighty percent (80%) share of the thin-film market.

17.     The purchasers of low-shrink EVA encapsulants are PV module manufacturers.   PV module manufacturers incorporate the low-shrink EVA encapsulants into their process of manufacturing solar modules.

18.     During the process of manufacturing solar modules, encapsulation is typically achieved by means of vacuum lamination.   Thin sheets of EVA are inserted above and often also below the solar cells within the PV module.   Heating the entire module causes the EVA to melt and flow around the solar cells, encapsulating them, followed by curing the EVA, which bonds the module into a single unit.   The lamination step occurs near the end of the manufacturing process and is essential to the construction and long-term functioning of the PV module.

19.     Shrinkage of the EVA encapsulant can attend the manufacturing process. Shrinkage can cause holes in the encapsulant during lamination.   Such holes are defects because they increase the likelihood of moisture leading to delamination and corrosion. If a PV module contains shrinkage-related defects, it may be rejected or cause malfunctioning if installed.

20.     EVA-based encapsulants are divided into traditional and low-shrink products, based on the amount of shrinkage measured from the time the EVA encapsulant sheet is heated from room temperature to a molten state.   Traditional EVA encapsulants typically exhibit an unsupported shrink rate of forty percent (40%) or higher.   In this

context, "unsupported" means a free standing film, *i.e.*, a film that is not in contact with any other surface that could restrict its shrinkage. Low-shrink EVA is defined as having an unsupported shrink rate of approximately twenty percent (20%) or less.

21.     None of the materials other than low-shrink EVA encapsulant used to laminate PV modules are part of the relevant product market. From the purchasers' perspective, EVA-based encapsulants are not reasonably interchangeable with other non-EVA encapsulants for several reasons, including the distinct qualities and capabilities of low-shrink EVA. First, shrinkage during the manufacturing process may result in voids, or holes, in the encapsulant during the lamination process. A void or hole in the encapsulant portion of a constructed PV module as sold to an end-user will provide a preferential location for moisture accumulation and can result in delamination and, therefore, deterioration or failure of the entire module. Preventing deterioration of the solar module is of critical importance to solar module manufacturers who generally provide 20-25 year warranties for their solar module products. Low-shrink EVA reduces voids or holes formed during the lamination process down to a very small fraction of one percent (1%) of all solar modules made, and far below the percentage resulting from the use of traditional-shrink EVA or any other encapsulant.

22.     Second, in contrast to traditional-shrink EVA, low-shrink EVA maintains its size and shape throughout the manufacturing process, thereby reducing manufacturing defects. In addition, low-shrink EVA has superior thermal dimensional stability that allows it to be used at much higher initial lamination temperatures without risk of shrinkage. Higher lamination temperatures and shorter lamination cycles result in faster, more efficient production, thereby increasing factory productivity and reducing costs.

23.     Third, once a PV module manufacturer has incorporated low-shrink EVA into its manufacturing process, it is difficult to revert to traditional EVA.   The manufacturer would be required to redefine the lamination cycle parameters and increase lamination cycle times.  To revert to traditional-shrink EVA would affect productivity negatively.  PV module manufacturers that use low-shrink EVA have adjusted and fixed their lamination cycles through a series of qualification tests to yield the optimum PV module.  The substitution of traditional-shrink EVA for low-shrink EVA would cause excess thermal shrinkage during lamination, resulting in various kinds of defects within the PV module, including unacceptable voids in the encapsulant.

24.     The demand for low-shrink EVA is growing faster relative to that for other encapsulants, due to the superior characteristics of low-shrink EVA.   Those characteristics include improvements in manufacturing PV modules to allow faster lamination.

25.     PV module manufacturers do not view low-shrink EVA encapsulant as interchangeable with traditional-shrink EVA encapsulant.  STR has stated in its filings with the United States Securities and Exchange Commission ("SEC") that its customers "value" the above attributes of STR's low-shrink EVA encapsulant and that "[t]hese are critical to solar module manufacturers …."

26.     The low-shrink EVA market reveals a trend in which it is achieving a greater percentage of encapsulant sales, generally, and gradually replacing other encapsulants.  STR has acknowledged this trend, including in its May 11, 2010 earnings conference call.

**B.      The Relevant Geographic Market And Barriers To Entry**

27.      The relevant geographic market is global.

28.      The market for low-shrink EVA is international and includes the Americas, Europe, and Asia.  STR is the dominant player in the low-shrink EVA market, both in the United States and internationally.  STR sells its low-shrink EVA products in the Americas, Europe, Japan, China, Australia and Africa.  STR has little competition for its low-shrink EVA encapsulant, though some Asian companies now claim to produce low-shrink EVA.  Indeed, as set forth below, STR has acted improperly to exclude JPS from the low-shrink EVA market to sustain its position within the market.

29.      Barriers to entry to the low-shrink EVA market are rooted in STR's own conduct and the nature of the development and manufacturing process.

30.      First, STR uses "requirements contracts," also known as "take-or-pay" contracts, with six of its ten largest solar encapsulant customers.  Thus, on information and belief, seventy percent to eighty percent (70% - 80%) of STR's domestic low-shrink EVA sales are subject to take-or-pay contracts and fifty-six percent to sixty-four percent (56% - 64%) of world-wide low-shrink EVA sales are subject to take-or-pay contracts.

31.      These contracts provide that an STR customer must pay for a minimum quantity of low-shrink EVA, regardless of need.  Thus, an STR customer may have to pay for product it does not need and/or does not use.  On further information and belief, STR's take-or-pay contracts have multi-year terms.  STR's take-or-pay contracts with its customers effectively are exclusive in nature.  As such, they constitute a barrier to entry into the low-shrink EVA encapsulant market for potential competitors.

32.     Second, the manufacturing of low-shrink EVA encapsulants is not easily accomplished.  A potential competitor may require concentrated trial and error with persons of substantial skill in the art of a year or more to develop the technology and process for producing low-shrink EVA encapsulants.  STR itself claims its process for manufacturing low-shrink EVA is a trade secret, a fact which it litigated against JPS in Massachusetts state court, as set forth in further detail herein.

33.     Finally, each time a manufacturer of a PV module necessarily alters its production process because of changing EVA encapsulant suppliers or to gain the full benefit of switching from traditional to low-shrink EVA, it is required to repeat its product certification through Underwriters Laboratories ("UL"), TUV Rheinland Group ("TUV"), or another accredited body.  That process normally requires a manufacturer to conduct internal testing to verify efficacy and conformance with standards prior to seeking certification.  The entire process is time-consuming and costly.

## II.  STR's Market Dominance

34.     STR dominates the market for low-shrink EVA in the United States and internationally, with sufficient market power for monopolization, or, in the alternative, a dangerous probability of success in achieving monopoly power.

35.     STR's market power is evidenced by its dominant market share.  On information and belief, STR has a ninety percent (90%) or greater share of the United States market for low-shrink EVA encapsulants.  In recent years, STR has received grants totaling in excess of $10 million from the United States government under the Defense Protection Act Title III program.  In its grant applications, STR promotes itself as the sole United States source for EVA encapsulants, including low-shrink EVA encapsulants.

36.     STR says in its sales literature that its low-shrink EVA encapsulant product is, "by far, the dominant choice of materials for the front layer of the encapsulant and accounts for significant use in back of the cells as well …."   Many major solar module manufacturers issue specifications for the EVA encapsulant they will use in their manufacturing process, and these specifications require low-shrink EVA of the type made by STR and eliminate traditional-shrink EVA.

37.     STR's worldwide share of the low-shrink EVA encapsulants market, on information and belief, is in excess of eighty percent (80%).

38.     STR's only competitors for the low-shrink EVA encapsulants market are JPS, and possibly some small Asian companies.

39.     As a result of its monopoly power, STR was able to charge a supra-competitive price.   On information and belief, when JPS first entered the market, STR charged an average of approximately $4.75 per square meter of low-shrink EVA encapsulant.   The price of JPS' low-shrink EVA encapsulant, which is equal in quality, was substantially less than STR's average price per square meter.   STR's ability to charge a higher price was not the result of better service or a better product.   Its reputation in the photovoltaic industry for service was and is regarded by many as poor.

40.     Left to its own devices, STR's anticompetitive conduct serves to maintain or extend STR's monopoly power, or creates a dangerous probability that STR will achieve monopoly power, in the United States and internationally for low-shrink EVA encapsulants.

### III.    STR's Anticompetitive Conduct

41.    STR continues to engage in an illegal anticompetitive overall scheme to exclude JPS from the market for low-shrink EVA encapsulants by instituting sham litigation, employing exclusionary contracts with its customers to bar or limit new entrants, in having sought what effectively was an unreasonable and anticompetitive license precluding JPS from producing EVA encapsulants even by methods not comprised of any components of STR's purported trade secret, blocking JPS from purchasing other technologies available to manufacture low-shrink EVA that are publicly available and currently for sale, barring JPS' access to some materials suppliers, and disparaging JPS within the photovoltaic industry for the purpose of driving away its potential customers and suppliers.   Each of these components of STR's overall anticompetitive and exclusionary conduct arises from STR's subjective and bad-faith intent to prevent, impede, or delay JPS' entry into the relevant market.

**A.    STR's Sham Litigation**

42.    On August 30, 2007, JPS issued a press release introducing its new PV encapsulant product line consisting of low-shrink EVA encapsulants.

43.    Soon thereafter, in September 2007, JPS exhibited production samples of its new low-shrink EVA encapsulant at the 22nd European Photovoltaic Solar Energy Conference and Exhibition in Milan, Italy.

44.    On October 2, 2007, STR filed suit against JPS in the Superior Court of The Commonwealth of Massachusetts, Hampshire County, Civil Action No. 07-00200 (the "litigation").   The basis of STR's suit is the accusation that JPS misappropriated STR's trade secret method (a combination and sequence of manufacturing steps) for

producing low-shrink (shrinkage of less than twenty percent (20%) EVA PV encapsulant products, colloquially identified later in the litigation as "Method 1."

45.     STR's litigation, however, is objectively baseless, as set forth in further detail herein, because Method 1 had lost its purported secret status, the *sine qua non* of any trade secret claim, to the extent it ever was a viable trade secret.  Specifically, Macro Engineering & Technology, Inc. ("Macro"), a Canadian equipment manufacturer, made Method 1 known within the relevant market, on information and belief, by no later than late 2007 or early 2008.

46.     Notwithstanding this fact fatal to its claims, STR pressed six counts against JPS and James Galica, a current employee of JPS who was previously employed by STR.  Those counts against JPS are Statutory Misappropriation of Trade Secret; Common Law Misappropriation of Trade Secret; and Violation of M.G.L. c. 93A.  As to Mr. Galica, STR asserts counts for Breach of Contract; Breach of Covenant of Good Faith and Fair Dealing; and Breach of Fiduciary Duty.

47.     As it must to maintain the litigation, STR asserts that it pioneered and invented Method 1 for the production of low-shrink EVA encapsulant.  STR, via its *Verified Complaint*; its Answers to JPS' First Interrogatories (No. 6); and the *Joint Pre-Trial Memorandum*; among other filings and submissions in the litigation, stated that STR alone developed the process for making STR's low-shrink EVA encapsulants and first created the product itself, and that STR considers the process its trade secret. Further, STR, again via its Answers to JPS' First Interrogatories (No. 21), among other filings and submissions in the litigation, stated that no one outside of STR (other than Mr. Galica and JPS) knows the full detail of the equipment, methodology, and theory behind

Method 1, and that it is STR's normal course of business to enter into non-disclosure/confidentiality agreements with third parties to protect the secrecy of Method 1.

48.     After an August 2008 jury trial on all counts except the M.G.L. c. 93A claim, a jury accepted STR's claim that it possessed a trade secret in Method 1, but found that JPS did not misappropriate that trade secret, and that STR was not damaged by any conduct of Mr. Galica.  Accordingly, judgment will enter for JPS on all counts tried before the jury.

49.     Post-jury trial, on June 29, 2009, the Superior Court ruled on STR's M.G.L. c. 93A claim and, despite the jury verdict, found that JPS and Mr. Galica misappropriated STR's Method 1 trade secret.  Further, the Superior Court, as requested by STR, preliminarily enjoined JPS from "manufacturing, marketing, selling (or otherwise alienating) its [PV encapsulant products – low-shrink or otherwise, EVA-based or otherwise, or by any other comparable methods].  Further, the defendants are preliminarily enjoined from using or disclosing STR's [Method 1] trade secret."  The Superior Court has yet to issue a final judgment or permanently enjoin JPS, pending an August 2010 hearing to determine STR's M.G.L. c. 93A damages and the scope and duration of a permanent injunction.

50.     Immediately following the Superior Court's M.G.L. c. 93A ruling, JPS sought to modify the preliminary injunction on the grounds that it covered EVA (traditional and low-shrink) and TPU-based encapsulants  made using several different methods, identified as Methods 1 through 5, only the first of which used the same or nearly the same processes and sequences as STR's Method 1.  JPS sought to limit the

injunction only to those EVA-based encapsulants manufactured using Method 1 – the only purported trade secret at issue.

51.     The harm caused by the overbroad injunction is great.  JPS was and is unable to fulfill orders, JPS' goodwill and reputation was and is irretrievably harmed, and JPS faces the shuttering or significant downsizing of its PV encapsulant business.

52.     STR opposed modifying the preliminary injunction in any manner – regardless of the fact that JPS' encapsulant products are manufactured by methods other than Method 1 and can be based on the distinctly different base ingredient TPU.  STR unreasonably sought to maintain the overly broad injunction in order to permanently harm JPS' business and exclude JPS not only from the relevant low-shrink EVA encapsulant market, but the PV encapsulant market, generally.

53.     Ultimately, JPS successfully persuaded the Superior Court to exclude from the preliminary injunction JPS' encapsulant products produced by Methods 2 and 3.  JPS, however, remains enjoined in all other respects from using Methods 1, 4, and 5, or any other method whatsoever, to produce EVA encapsulants (traditional and low-shrink).  The irreparable harm caused by STR's injunction continues.

54.     STR, however, knew or should have known that its suit against JPS was and remains objectively baseless because its putative Method 1 trade secret was known publicly within the low-shrink EVA encapsulant market, a fact fatal to its trade secret claim.  STR has willfully misrepresented or recklessly disregarded this fatal fact.

55.     By way of background, STR admits in its Answers to JPS' First Interrogatories that it purchased the equipment comprising Method 1 for its Spain facility from Macro, on information and belief, in 2002 or 2003, as well as certain equipment for

its Method 1 manufacturing line at its domestic facility in Enfield, Connecticut, on information and belief, in 1997 or 1998. STR further represented in its Answers to JPS' First Interrogatories that it entered into a non-disclosure agreement with Macro (the "Macro NDA") specifically identifying Method 1 as STR's intellectual property and prohibiting Macro from reproducing the design or disclosing the details or existence of the design to any third party.

56.    Moreover, STR admits in its Answers to JPS' First Interrogatories and in its Subcontract Report to the National Renewable Energy Laboratory, dated April 2008, that Macro designed and fabricated certain (if not all) equipment comprising Method 1. Macro, therefore, either designed Method 1 in total or otherwise has intimate, working knowledge of Method 1 and the theories and principles by which Method 1 operates to produce low-shrink EVA encapsulant.

57.    Despite STR's representations that Method 1 is its trade secret, JPS first learned in November 2009 that Macro, on information and belief, was promoting and offering for sale internationally equipment to produce low-shrink EVA no later than late 2007 or early 2008 – possibly prior to the commencement of the litigation and certainly as of the jury trial of STR's claims. Still later, JPS learned that Macro's equipment to produce low-shrink EVA was, in fact, Method 1. Macro's activities, on information and belief, occurred via multiple, major industry trade shows – Argenplas in Buenos Aires, Argentina in March 2008; Plastimagen in Mexico City, Mexico in April 2008; Chinaplas in Shanghai, China in April 2008; Plastindia in New Delhi, India in February 2009; and NPE in Chicago, Illinois in June 2009. Presenters and attendees at these industry trade shows consist of tens of thousands of major participants in the relevant market, including

equipment manufacturers, product manufacturers, suppliers, ultimate end-users/customers, as well as industry consultants, media, and trade organizations. For example, the Chinaplas trade show in 2008 had 72,161 attendees. Moreover, on information and belief, Macro has directly marketed Method 1 to several companies in India and other companies throughout Asia.

58.     Based on further investigation, JPS believes that, while Macro may have been or be bound by an NDA, the Macro NDA either is limited temporally to five (5) years and has since lapsed, or limited territorially to North America, or some combination thereof. STR's practice with respect to NDAs is to seek terms of five (5) years, with options to extend.

59.     Notwithstanding (or in light of) these facts fatal to its trade secret claim in Method 1, STR neither produced the Macro NDA nor disclosed the fact that Macro has been marketing and/or selling Method 1 publicly, despite reasonable discovery requests in the litigation calling for same – JPS' First Interrogatories (No. 21) and First Request for Production (Nos. 1, 9, 10 ) – and STR's representations that it would produce same – STR's response to JPS' First Request for Production, Response Nos. 1 and 9: "STR will produce all non-privileged documents responsive … following entry of a suitable Protective Order" and No. 10: "STR will produce all documents responsive … that are not privileged and not protected by the work product doctrine." Such a suitable Protective Order was agreed to and entered by the Superior Court on March 7, 2008. Indeed, STR necessarily knew, or reasonably should have known, of these facts and produced them in the litigation given its own admission of the existence of the Macro NDA. Further, while the market for low-shrink EVA encapsulants is global, it is

comprised of relatively few players, with STR being the major market force. Accordingly, STR was able to and, on information and belief, did monitor and police its NDAs with vendors and third parties, as well as its competitors' activities, and is aware of Macro's activities.  Indeed, even Breyer Gmbh, a German equipment manufacturer, is aware of Macro promoting its low-shrink EVA equipment throughout Asia.

60.    Consequently, STR knew or should have known prior to the commencement of the litigation or during its prosecution of the litigation that Method 1 is publicly known within the relevant market and, therefore, not a trade secret.  Undaunted, STR obfuscated, withheld, and/or recklessly disregarded the available information exculpating JPS from wrongdoing and fatal to STR's claims in the litigation.

61.    STR's motivation in instituting and maintaining the litigation was and is the unlawful purpose of interfering directly with JPS' business within, and achieving a monopoly of, the relevant market.  Had such information been disclosed by STR, it could not have reasonably instituted or maintained the litigation, let alone expected to prevail in proving that Method 1 is its trade secret.  Nor would STR have succeeded in persuading the jury that it possessed a trade secret, persuading the Superior Court that JPS' conduct violated M.G.L. c. 93A, or obtaining an injunction barring JPS from making EVA encapsulants by Method 1 or any other method.  JPS would have received a complete defense verdict, exonerating it from all of STR's accusations.  Such a result, of course, would have meant that JPS would remain a growing threat to STR's monopoly in the low-shrink EVA encapsulant market.  Consequently, STR premised and/or maintained litigation on what may amount to a fraud on the court and/or acted in such a way as to

deprive the litigation of any legitimacy by using it to interfere directly with JPS' business relationships.

62.     STR's unlawful purpose in instituting its objectively baseless litigation is further evidenced by the fact that STR has incurred significant litigation costs with the prospect of a comparatively minimal damages award.  JPS is a new market entrant with little sales of low-shrink EVA encapsulants.  Further, STR, rather than seeking at the outset of its litigation a customary preliminary injunction to halt JPS' alleged misappropriation, forged ahead with wide-ranging and expensive discovery and motion practice.

63.     The consequence of STR's bad faith litigation not only is to exclude JPS from the relevant market, but also to force JPS to incur substantial legal fees, permit STR to disparage JPS within the market under the cloak of the litigation, harm JPS' goodwill within the relevant market, and drive customers, potential customers, and vendors away from JPS and to maintain its monopoly power, generally.

**B.     Other Anticompetitive Acts**

64.     As also noted as a barrier to entry, STR uses "requirements contracts," also known as "take-or-pay" contracts, with multi-year terms, with six of its ten largest solar encapsulant customers.  Thus, on information and belief, seventy percent to eighty percent (70% - 80%) of STR's total low-shrink EVA sales are subject to take-or-pay contracts and fifty-six percent to sixty-four percent (56% - 64%) of world-wide low-shrink EVA sales are subject to take-or-pay contracts.  On information and belief, JPS lost substantial sales it otherwise could have made but for the existence of multi-year

take-or-pay contracts between STR and major purchasers of low-shrink EVA solar encapsulant.

65.    In conjunction with STR's sham litigation and efforts to bar JPS from marketing any EVA encapsulants, STR offered what is in effect a license to JPS for the use of Methods 2 and 3.  During the post-ruling preliminary injunction hearings (in which JPS originally was enjoined from practicing Methods 1 through 5 and anything comparable to Methods 1 through 5), STR approached JPS with an offer to permit JPS the use of Methods 2 and 3, but only for the production of traditional-shrink EVA encapsulants, so long as JPS did not sell its EVA encapsulants with a shrinkage value of less than forty percent (40%).  STR falsely markets on its website that its low-shrink EVA encapsulants have a zero percent (0%) shrinkage value as a result of Method 1.  STR's licensing offer was unreasonable for a number of reasons, other than the fact that the litigation and settlement were predicated on a sham.  First, Methods 2 and 3 do not use any of the processes and sequences identified by STR as part of its Method 1 trade secret for manufacturing low-shrink EVA – the only trade secret at issue in the litigation.  Second, Methods 2 and 3 are and have been in the public domain for years and, therefore, could not possibly be STR's proprietary intellectual property.  Specifically, Welex, Inc., a manufacturer of plastics sheet extrusion equipment, and many other equipment manufacturers, including Davis Standard LLC, publicly offer Methods 2 and/or 3 for sale.

66.    Apart from seeking to bar JPS from manufacturing any EVA encapsulant by Method 2 or 3, STR also sought to bar JPS from manufacturing by Methods 4 and 5, or any other existing or conceivable method.  Davis Standard, LLC and Windmoeller &

Hoelscher Corp. both publicly offer Method 4 for sale.  Moreover, Breyer Gmbh, a German equipment manufacturer, and Noritake Co., LTD., a Japanese equipment manufacturer, offer methods comparable to Method 5.  Both Breyer and Noritake state that their equipment produces low-shrink EVA encapsulants.  These facts are known publicly and regularly publicized through web sites, sales literature, and industry trade shows.

67.     The only other discussion of settlement by STR was its offer to purchase outright JPS' division of Stevens Urethane, Inc., accompanied by requests for financial and other information relative to JPS' operations.  JPS offered to continue the dialogue and provide the requested information at its offices in Greenville, South Carolina.  STR, however, refused to travel to South Carolina, claiming that the travel required was unreasonably inconvenient.  STR then ceased negotiations.

68.     Under the guise of its litigation against JPS, STR, on information and belief, also communicated its objectively baseless claims to JPS' customers (United Solar Ovonic), potential customers (SunPower Corp. and BP Solar International, Inc.), industry experts (Dr. John Pern of the National Renewable Energy Laboratory), suppliers (AT Plastics, Inc.), and within the industry generally (22nd European Photovoltaic Solar Energy Conference and Exhibition).  Based on confidential information, STR disparaged JPS by claiming to other relevant entities within the market that JPS had misappropriated the Method 1 trade secret, despite STR's knowledge or reckless disregard that Method 1 was publicly divulged.  For example, and based on confidential information, on a specific date and time, STR communicated to one of its customers commercially derogatory information about JPS concerning JPS' misappropriation of STR's trade secret.  Further,

based on that same confidential information, STR made similar communications to additional STR customers around the same time period.

69.     With respect to JPS' supplier, JPS understands based on confidential information that STR improperly sought to enforce a purported contract as an exclusivity agreement in order to block that supplier from providing base-EVA resins to JPS for the production of low-shrink EVA encapsulants.

70.     STR's purpose in engaging in anticompetitive conduct against JPS was to drive JPS out of the market. Specifically, it desired to tie up the materials supplier market with exclusionary contracts that would have the effect of marginalizing or eliminating its domestic competitors, such as JPS.

71.     STR's motivation for commencing and maintaining its objectively baseless and unreasonable litigation against JPS lay not only in unlawfully interfering directly with JPS' business within and improperly excluding JPS from the low-shrink EVA encapsulant market, but also in solidifying STR's market share in advance of STR's initial public offering ("IPO"). The parent company of STR, STR Holdings, LLC, filed its IPO with the SEC on July 31, 2008, immediately preceding the jury trial in Superior Court. On information and belief, at the time that STR filed suit almost one year earlier, in October, 2007, it was aware of the increased competition it would face by JPS' entry into the relevant market, and the effect of that competition on its profit projections and consequent IPO share price. To preserve its profit margins and market share, and to maximize its share price, STR employed the litigation to burden JPS with the legal costs and lost sales, and to damage JPS' goodwill. In this manner, and irrespective of STR's meritless and improperly asserted claims, STR and its executives were able to realize a

higher profit from STR Holdings, LLC's IPO, at the expense of JPS' business.  STR and its insiders, including its officers and directors, realized in excess of $120 million from the IPO.

72.     By way of a further April 12, 2010 registration with the SEC, STR's executives and insiders sought another offering as selling stockholders.     STR's executives' motivation in maintaining the litigation under a false premise to improperly exclude JPS from the low-shrink EVA encapsulant market and to solidify STR's market share in advance of and following their second offering remains strong in order to maximize STR's share price and their own personal profits.

## IV.     Antitrust Injury

73.     STR's unlawful conduct has injured competition for the sale of low-shrink EVA encapsulants in the United States and international markets.  Purchasers have been deprived of a free and unfettered competitive market for low-shrink EVA encapsulants.

74.     JPS was and is an actual competitor in the relevant market affected by STR's anticompetitive conduct.  JPS has suffered injury as a result of STR's conduct, including the loss of actual and potential customers, lost profits, and the loss of goodwill. STR has deprived JPS of the opportunity to compete freely in the marketplace with STR.

## First Claim For Relief
### [Sham Litigation To Monopolize In Violation of 15 U.S.C. § 2]

75.     Plaintiff repeats and incorporates the allegations contained in paragraphs 1 through 74 as if set forth fully herein.

76.     There is a relevant market for the sale of low-shrink EVA encapsulants in the United States and internationally.

77.     STR has monopoly power in the relevant market.

78.     STR has initiated and maintained an objectively baseless lawsuit for misappropriation of trade secret without any good-faith, reasonable belief that it could prevail in the litigation and with the subjective intent to prevent, impede, or delay JPS' entry into the relevant market.

79.     STR's sham litigation has occurred in, and is having a substantial effect on, interstate commerce.

80.     STR's sham litigation has injured and will continue to injure consumers and competition in the relevant market.

81.     As a direct and proximate result of STR's sham litigation, JPS has been injured and sustained damages.  JPS will continue to sustain predictable damages in the future.  Without enjoining the complained of activities, JPS will suffer immediate further irreparable harm for which JPS has no adequate remedy at law.

82.     As a direct competitor that was targeted by STR's sham litigation, JPS has standing to bring this claim.

83.     JPS is entitled to recover its damages pursuant to Section 2 of the Sherman Act, found at 15 U.S.C. § 2.  JPS also is entitled to a permanent injunction restraining STR from engaging in the sham litigation and other anticompetitive conduct including, without limitation, exclusionary contracts.

## Second Claim For Relief
### [Sham Litigation To Attempt To Monopolize In Violation of 15 U.S.C. § 2]

84.     Plaintiff repeats and incorporates the allegations contained in paragraphs 1 through 83 as if set forth fully herein.

85.     There is a relevant market for the sale of low-shrink EVA encapsulants in the United States and internationally.

86.     STR has attempted to monopolize the relevant market.

87.     There is a dangerous probability that STR will succeed in its attempt to acquire or maintain monopoly power in the relevant market.

88.     STR has filed and maintained an objectively baseless lawsuit for misappropriation of trade secret without any good-faith, reasonable belief that it could prevail in the litigation and with the subjective intent to prevent, impede, or delay JPS' entry into the relevant market.

89.     STR's sham litigation has occurred in, and is having a substantial effect on, interstate commerce.

90.     STR's sham litigation has injured and will continue to injure consumers and competition in the relevant market.

91.     As a direct and proximate result of STR's sham litigation, JPS has been injured and sustained damages.  JPS will continue to sustain predictable damages in the future.  Without enjoining the complained of activities, JPS will suffer immediate further irreparable harm for which JPS has no adequate remedy at law.

92.     As a direct competitor targeted by STR's sham litigation, JPS has standing to bring this claim.

93.     JPS is entitled to recover its damages pursuant to Section 2 of the Sherman Act, found at 15 U.S.C. § 2.  JPS also is entitled to a permanent injunction restraining STR from engaging in the sham litigation and other anticompetitive conduct including, without limitation, exclusionary contracts.

### Third Claim For Relief
### [Overall Scheme To Monopolize In Violation of 15 U.S.C. § 2]

94.     Plaintiff repeats and incorporates the allegations contained in paragraphs 1 through 93 as if set forth fully herein.

95.     There is a relevant market for the sale of low-shrink EVA encapsulants in the United States and internationally.

96.     STR has monopoly power in the relevant market.

97.     STR has taken affirmative exclusionary actions to acquire and maintain its monopoly power in the relevant market.

98.     STR has willfully engaged in a pattern and practice of exclusionary conduct in furtherance of its overall scheme to monopolize, including, but not limited to:

  i.     The filing and maintenance of sham misappropriation of trade secret litigation regarding Method 1;

  ii.    Based upon the bad faith withholding of material information relevant to the sham litigation, offering an unreasonable license to produce traditional EVA encapsulants with publicly-known methodologies while barring JPS from the relevant market;

  iii.   Using exclusionary multi-year "take-or-pay" contracts with its customers to bar or limit access to the market by new entrants, including JPS;

  iv.    Defaming and disparaging JPS to customers and suppliers within the relevant market; and

  v.     Threatening suppliers of base-EVA materials to withhold supplies to competitors.

99.     The foregoing acts, among others, and the continuing course of STR's anti-competitive conduct have harmed and threaten to continue to harm consumers and competition in the relevant market.

100.    STR undertook these acts with the intent to acquire and maintain its monopoly power in the relevant market.

101.    STR's conduct has occurred in, and is having a substantial effect on, interstate commerce.

102.    As a direct and proximate result of STR's exclusionary and anticompetitive conduct, JPS has been injured and sustained damages.  JPS will continue to sustain predictable damages in the future.  Without enjoining the complained of activities, JPS will suffer immediate further irreparable harm for which JPS has no adequate remedy at law.

103.    As a direct competitor targeted by STR's anticompetitive conduct, JPS has standing to bring this claim.

104.    JPS is entitled to recover its damages pursuant to Section 2 of the Sherman Act, found at 15 U.S.C. § 2.  JPS also is entitled to a permanent injunction restraining STR from engaging in the sham litigation and other anticompetitive conduct including, without limitation, exclusionary contracts.

## Fourth Claim For Relief
### [Overall Scheme To Attempt To Monopolize In Violation of 15 U.S.C. § 2]

105.    Plaintiff repeats and incorporates the allegations contained in paragraphs 1 through 104 as if set forth fully herein.

106.    There is a relevant market for the sale of low-shrink EVA encapsulants in the United States and internationally.

107.    STR has attempted to monopolize the relevant market.

108.    STR has a specific intent to monopolize, and it has taken affirmative exclusionary acts in furtherance of its attempt to monopolize.

109.   There is a dangerous probability that STR will succeed in its attempt to acquire or maintain monopoly power in the relevant market.

110.   STR has willfully engaged in a pattern and practice of exclusionary conduct in furtherance of its overall scheme to monopolize, including, but not limited to:

    i.    The filing and maintenance of sham misappropriation of trade secret litigation regarding Method 1;

    ii.    Based upon the bad faith withholding of material information relevant to the sham litigation, offering an unreasonable license to produce traditional EVA encapsulants with publicly-known methodologies while barring JPS from the relevant market;

    iii.    Using exclusionary multi-year "take-or-pay" contracts with its customers to bar or limit access to the market by new entrants, including JPS;

    iv.    Defaming and disparaging JPS to customers and suppliers within the relevant market; and

    v.    Threatening suppliers of base-EVA materials to withhold supplies to competitors.

111.   The foregoing acts, among others, and the continuing course of STR's anti-competitive conduct have harmed and threaten to continue to harm consumers and competition in the relevant market.

112.   STR undertook these acts with the intent to attempt to monopolize the relevant market.

113.   STR's conduct has occurred in, and is having a substantial effect on, interstate commerce.

114.   As a direct and proximate result of STR's exclusionary and anticompetitive conduct, JPS has been injured and sustained damages.  JPS will continue to sustain predictable damages in the future.   Without enjoining the complained of

activities, JPS will suffer immediate further irreparable harm for which JPS has no adequate remedy at law.

115.    As a direct competitor that was targeted by STR's anticompetitive conduct, JPS has standing to bring this claim.

116.    JPS is entitled to recover its damages pursuant to Section 2 of the Sherman Act, found at 15 U.S.C. § 2.  JPS also is entitled to a permanent injunction restraining STR from engaging in the sham litigation and other anticompetitive conduct including, without limitation, exclusionary contracts.

### Fifth Claim For Relief
### [Unfair Competition In Violation of 15 U.S.C. § 1125]

117.    Plaintiff repeats and incorporates the allegations contained in paragraphs 1 through 116 as if set forth fully herein.

118.    STR has made false or misleading statements to JPS' customers, suppliers, vendors, and the industry, generally, in the relevant market concerning JPS' conduct, and the validity, enforceability and breadth of its Method 1 trade secret, all as they relate to low-shrink EVA encapsulants.

119.    STR has made false or misleading statements to JPS' customers, suppliers, vendors, and the industry, generally, in the relevant market about the characteristics and qualities of STR's low-shrink EVA encapsulants.

120.    STR used its baseless lawsuit for misappropriation of trade secret as a marketing device to mislead JPS customers and the relevant market about JPS' conduct and products and to gain a competitive advantage over JPS.

121.    The statements described above, among others, have actually deceived or have the tendency to deceive their audience.

122.    The statements described above, among others, are material in that they are likely to influence purchasing decisions.

123.    STR's statements have been made in bad faith.

124.    JPS' products, including its and low-shrink EVA encapsulants, are sold in interstate commerce.

125.    As a direct and proximate result of STR's conduct, JPS has suffered and continues to suffer actual damages, including lost prospective and actual business, lost profits, loss of goodwill, and damage to its reputation and the reputation of its products, and out-of-pocket and other litigation-related expenses in an amount to be determined at trial.

126.    Unless the activities complained of are enjoined, JPS will suffer immediate and further irreparable injury for which JPS has no adequate remedy.

**Sixth Claim For Relief**
**[Violation of M.G.L. c. 93A, § 11]**

127.    Plaintiff repeats and incorporates the allegations contained in paragraphs 1 through 126 as if set forth fully herein.

128.    STR is a person engaged in the conduct of trade or commerce within the meaning of M.G.L. c. 93A.

129.    STR's acts and conduct described above constitute unfair and deceptive acts and practices in the conduct of trade or commerce in The Commonwealth of Massachusetts within the meaning of M.G.L. c. 93A, § 11.  For example, STR has willfully engaged in the following unfair and deceptive acts and practices in furtherance of its overall scheme to monopolize, including, but not limited to:

     i.       The filing and maintenance of sham misappropriation of trade secret litigation regarding Method 1;

     ii.      Based upon the bad faith withholding of material information relevant to the sham litigation, offering an unreasonable license to produce traditional EVA encapsulants with publicly-known methodologies while barring JPS from the relevant market;

     iii.     Using exclusionary multi-year "take-or-pay" contracts with its customers to bar or limit access to the market by new entrants, including JPS;

     iv.     Defaming and disparaging JPS to customers and suppliers within the relevant market; and

     v.      Threatening suppliers of base-EVA materials to withhold supplies to competitors.

130.    The foregoing unfair and deceptive acts and practices of, and harm caused by, STR occurred primarily and substantially in Massachusetts.

131.    As a direct and proximate result of STR's unfair and deceptive acts or practices, JPS has been injured and sustained damages.  JPS will continue to sustain predictable damages in the future.

132.    STR's unfair and deceptive acts or practices were and are willful and knowing violations of M.G.L. c. 93A.

### Prayer For Relief

Wherefore, Plaintiff JPS Elastomerics Corp. respectfully requests the entry of judgment in its favor as to all claims for relief and against Defendant Specialized Technology Resources, Inc., as follows:

(1)    Award, on Counts I-III, a judgment in favor of JPS Elastomerics Corp. and against Specialized Technology Resources, Inc., including, without limitation, compensatory damages in an amount in excess of Sixty Million Dollars

($60,000,000.00), with the exact amount to be determined at trial, to compensate JPS Elastomerics Corp. for the harm caused by the anticompetitive and tortious acts of Specialized Technology Resources, Inc.;

(2)     Award, on Counts I-III, to JPS Elastomerics Corp. and against Specialized Technology Resources, Inc., treble damages under the Sherman Act, the Lanham Act, and/or M.G.L. Chapter 93A;

(3)     Award, on Counts I-III, to JPS Elastomerics Corp and against Specialized Technology Resources, Inc., a permanent injunction prohibiting further actions, threatened action, misrepresentations as to JPS Elastomerics Corp., its customers, or potential customers regarding the alleged misappropriation of the trade secret of Specialized Technology Resources, Inc., specifically, Methods 1, 2, 3, 4, or 5, or any other methods whatsoever, for the manufacture of ethylene vinyl acetate photovoltaic encapsulants;

(4)     Award, on Counts I-III, to JPS Elastomerics Corp and against Specialized Technology Resources, Inc., a permanent injunction prohibiting further use by Specialized Technology Resources, Inc. of exclusionary "take-or-pay" contracts with a term of more than one year;

(5)     Award, on Counts I-III, to JPS Elastomerics Corp and against Specialized Technology Resources, Inc., an award of pre-judgment and post-judgment interest, its attorneys' fees for defense of the prior sham litigation and for the prosecution of this action, and its costs; and

(6)     Award to JPS Elastomerics Corp and against Specialized Technology Resources, Inc. such other and further relief as this Court deems just and equitable,

including the disgorgement by Specialized Technology Resources, Inc. of all sums that it has obtained by way of its anticompetitive and tortious acts.

## DEMAND FOR JURY TRIAL

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES TRIABLE BY A JURY.**

Respectfully submitted,

**PLAINTIFF JPS ELASTOMERICS CORP.**
By its attorneys,

/s/ Michael C. Gilleran
Michael C. Gilleran | BBO No. 192210
Adam M. Weisberger | BBO No. 646844
Brian R. Birke | BBO No. 652720
ADLER POLLOCK & SHEEHAN P.C.
mgilleran@apslaw.com
aweisberger@apslaw.com
bbirke@apslaw.com
175 Federal Street
Boston, MA  02110
T: 617.482.0600
F: 617.482.0604

Dated: July 7, 2010