UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JPS ELASTOMERICS CORP., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:10-cv-11142-MAP |
| | ) | |
| SPECIALIZED TECHNOLOGY | ) | <u>Leave to File Granted on</u> |
| RESOURCES, INC. | ) | <u>December 17, 2010</u> |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S SUR-REPLY IN SUPPORT OF ITS OPPOSITION
<u>TO DEFENDANT'S MOTION TO DISMISS/STAY</u>**

Dated: December 20, 2010

Respectfully submitted,

JPS ELASTOMERICS CORP.
By its attorneys,

Michael C. Gilleran | BBO No. 192210
Adam M. Weisberger | BBO No. 646844
Brian R. Birke | BBO No. 652720
ADLER POLLOCK & SHEEHAN P.C.
mgilleran@apslaw.com
aweisberger@apslaw.com
bbirke@apslaw.com
175 Federal Street
Boston, MA  02110
T: 617.482.0600
F: 617.482.0604

## TABLE OF CONTENTS

I.      Numerous Courts Have Construed A Fraud/Illegitimacy Sham
        Litigation Exception To *Noerr-Pennington* Immunity                    1

II.     A Majority Of Courts Have Recognized And/Or Analyzed
        A Fraud/Illegitimacy Exception In Similar Circumstances                2

        A.      The Additional Cases Cited By JPS Establish
                The Fraud/Illegitimacy Sham Exception
                To *Noerr-Pennington* Immunity                                 5

        B.      Fraud/Illegitimacy Sham Exception Case Law
                Citing Walker Process Fraud Properly And Separately
                Construes The Sham Exception                                   6

III.    This Court Is The Proper And Only Forum For Relief From STR's
        Sham Litigation In Furtherance Of Its Monopoly                         7

IV.     JPS' Detailed Fact-Based Pleading More Than
        Sufficiently Alleges Plausible Grounds That
        STR Engaged In Actionable Antitrust Conduct                            9

V.      JPS Has Adequately Pled The Existence Of The
        Standing Element Known As "Antitrust Injury"                          10

VI.     JPS' Claims Meet Applicable Pleading Standards                        14

        A.      JPS Has Adequately Pled Monopolization Of A Relevant Market   14

        B.      JPS Has Met Pleading Standards Under The Lanham Act           14

VII.    Conclusion                                                            15

**I.    Numerous Courts Have Construed A Fraud/Illegitimacy Sham Litigation Exception To Noerr-Pennington Immunity**

STR misrepresents the rationale of this Court in *Boston Scientific Corp. v. Schneider (Europe) AG*, 983 F.Supp. 245, 272 (D. Mass. 1997), *dismissed sub nom., Boston Scientific Corp. v. Schneider (USA) Inc.*, 152 F.3d 947 (Fed. Cir. 1998) to argue that no court within the First Circuit has recognized the fraud/illegitimacy sham exception to *Noerr-Pennington* immunity. *Boston Scientific Corp.*, however, stating that a winning lawsuit is reasonable and not a sham, *citing Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 n.5 (1993), acknowledged that the antitrust plaintiff rebutted that imprimatur of reasonableness by alleging a sham because of fraud on the court or concealment of evidence. *Boston Scientific Corp.*, 983 F.Supp. at 272. Then, rather than "merely not[ing]" that the antitrust plaintiff asserted a fraud sham exception, this Court analyzed (referencing its earlier analysis) whether the alleged fraud adversely affected the antitrust plaintiff's opportunity to fully and fairly litigate the underlying claims. *Id.* at 256-57, 272. This Court held that the antitrust plaintiff failed to allege the type of fraud necessary to prove a sham litigation claim – that which affected the ability of a party to fully and fairly litigate a matter, *i.e.*, material misrepresentations affecting the core of a proceeding. *Id.* at 272. *See Baltimore Scrap Corp. v. David J. Joseph Co.*, 81 F.Supp.2d 602, 616, (D. Md. 2000), *aff'd*, 237 F.3d 394 (4th Cir. 2001); *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 124 (3rd Cir. 1999), *cert. denied*, 528 U.S. 871 (1999).

Further, the First Circuit in *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842 (1st Cir. 1985), *cert. denied*, 475 U.S. 1016 (1986), approached the fraud/illegitimacy sham exception before *Prof'l Real Estate Investors, Inc.* The *CVD, Inc.* court analyzed *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965), and its progeny (which held that a breach of duty of candor in patent prosecution vitiates First Amendment immunity from antitrust laws), to hold

that "the *assertion in bad faith* of trade secret claims, that is, with the knowledge that no trade

secrets exist, for the purpose of restraining competition does not further the policies of either the

antitrust or the trade secret laws ... and can be a violation of the antitrust laws." *Id.* at 850-51

(emphasis added), *citing Handgards, Inc. v. Ethicon, Inc.*, 601 F.2d 986, 993-96 (9th Cir. 1979),

*cert. denied*, 444 U.S. 1025 (1980); P. Areeda & D. Turner, 3 ANTITRUST LAW, § 708.[1]  There is

no material difference between the First Circuit's objectively baseless analysis in *CVD, Inc.* and

the fraud/illegitimacy sham exception to *Noerr-Pennington* immunity articulated in *Prof'l Real*

*Estate Investors, Inc.*, which left open "fraud," "misrepresentation," or "other misconduct" as

comprising sham activity excepted from *Noerr-Pennington* immunity.  *See Prof'l Real Estate*

*Investors, Inc.*, 508 U.S. at 61 n.6, *citing, Walker Process Equip., Inc.*, 382 U.S. at 176-77.  Both

turn on objectively baseless conduct premised on assertions in litigation, and both hold that such

assertions made to restrain competition violate the antitrust laws.

## II.    A Majority Of Courts Have Recognized And/Or Analyzed A Fraud/Illegitimacy Exception In Similar Circumstances

STR grossly misquotes and misreads the authorities construing a fraud/illegitimacy sham

exception to argue that other circuits have failed to acknowledge the exception.  When read

properly, however, each of the authorities cited by JPS supports a fraud/illegitimacy sham

exception to *Noerr-Pennington* immunity.  First, and contrary to the interpretation that STR

attributes to D. Davis, THE FRAUD EXCEPTION TO THE NOERR-PENNINGTON DOCTRINE IN

JUDICIAL AND ADMINISTRATIVE PROCEEDINGS, 69 U. Chi. L. Rev. 325 (Winter 2002), Davis

actually "argues that fraud and misrepresentations in judicial proceedings lie outside the realm of

---

[1] STR improperly cites *BE & K Constr. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516 (2002) for the inference that its falsehoods are protected.  The Supreme Court in *BE & K Constr. Co.* first referred to speech worthy of protections (press, public official, labor/employment), *id.* at 531-32, and did *not* include the type of commercial speech at issue in *Prof'l Real Estate Investors, Inc. Id.* at 530-31, 534-35 (qualifying commercial speech; holding that baseless suits fall outside of the First Amendment (and *Noerr* protection), as analogous to "false statements").

the First Amendment; thus the *Noerr-Pennington* doctrine should not apply." *Id.* at 326-27.[2]

Davis notes that the "fraud exception to the *Noerr-Pennington* doctrine makes sense[;]" the First

Amendment cannot protect fraud and misrepresentations that create judicial outcomes predicated

on false information and bar entry into markets for competitors. *Id.* at 340-42.

STR next misrepresents the holding and rationale of *Baltimore Scrap Corp. v. David J.*

*Joseph Co.*, 237 F.3d 394 (4th Cir. 2001) to reject a fraud/illegitimacy sham exception.

Specifically, STR cites the following language, omitting the emphasized phrase, which is

fundamental to the court's analysis:

> We reiterate that the Supreme Court has not approved a fraud exception to *Noerr-Pennington* immunity at all. *Yet the fraud exception as Baltimore Scrap conceives it would have wide ranging implications for our federal system as well as the Noerr-Pennington doctrine.* A broad fraud exception would allow federal collateral litigation over conduct in state courts that never affected the core of a state judgment. It is simply not the role of federal courts hearing antitrust lawsuits to reconsider the underlying validity of a state zoning contest. We would have to immerse ourselves in the minutiae of state civil proceedings and in effect relitigate the claims that the state courts have already decided. For the federal courts to entertain this type of antitrust action would impermissibly impact the right to petition a coordinate system of justice. Such concerns weigh heavily against creating any broad exception to the immunity created by *Noerr* and its numerous progeny.

*Id.* at 404 (emphasis added)(internal citations omitted). Central to the above rationale is the fact

that the antitrust plaintiff, Baltimore Scrap Corp., pursued (or "conceived") a "*broad*" fraud

sham exception that was *not* predicated on a "core" fraud that caused or affected a judgment, *i.e.,*

it was not material or otherwise denied a "legitimate" litigation opportunity. *Id.* at 402, 404. In

analyzing the *broad* proposal of the antitrust plaintiff, the court held that, "if a judgment is not

procured by fraud or deceit, it cannot fall within any fraud exception to *Noerr-Pennington.*" *Id.*

---

[2] Davis (as does STR) identifies only one case – *Armstrong Surgical Ctr., Inc. v. Armstrong County Mem'l Hosp.*, 185 F.3d 154 (3rd Cir. 1999), *cert. denied*, 530 U.S. 1261 (2000) – that refused to apply a fraud/illegitimacy sham exception, and which is contrary to law within its own circuit and has been limited to its own facts, as set forth below.   D. Davis, THE FRAUD EXCEPTION TO THE NOERR-PENNINGTON DOCTRINE IN JUDICIAL AND ADMINISTRATIVE PROCEEDINGS, 69 U. Chi. L. Rev. at 335, *citing Armstrong Surgical Ctr., Inc.*, 185 F.3d at 154-63.

at 402, citing, *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 61-62 n.6; *Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155, 158-59 (9th Cir. 1993), *cert. denied*, 513 U.S. 818 (1994). Consequently, the limitation in *Baltimore Scrap Corp.* applies only to that court's antitrust plaintiff's effort to create "[a] broad fraud exception" beyond that which "infected the core" of its lawsuit. *Baltimore Scrap Corp.*, 237 F.3d at 404.[3]   In accord with JPS' position, *Baltimore Scrap Corp.* stands for the principle that, where a judgment *is* procured by fraud, concealment, or misrepresentations, *Noerr-Pennington* immunity is inapplicable.

STR heralds *Armstrong Surgical Ctr., Inc.* for not acknowledging a fraud/illegitimacy sham exception.[4]   *Armstrong Surgical Ctr., Inc.*, however, declined to apply a misrepresentation exception to *Noerr-Pennington* immunity on the basis that the antitrust laws were not meant to usurp or interfere with states acting as regulators, regardless of anticompetitive injuries. *Armstrong Surgical Ctr., Inc.*, 185 F.3d at 162 (discussing regulation of healthcare facilities; holding that the "remedy for such conduct rests with laws addressed to it and not with courts looking behind sovereign state action .... Federalism requires this result ...."), *citing, City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365 (1991). Further, the *Armstrong Surgical Ctr., Inc.* court found that the alleged misrepresentation was not even "important," *i.e.*, material, to complained-of ruling. *Id.* at 163. Nor did the antitrust plaintiff allege that petitioning activity

---

[3] STR also erroneously cites *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119 (3rd Cir. 1999) for the same proposition – that no fraud/illegitimacy sham exception exists. Like *Baltimore Scrap Corp.*, however, the *Cheminor Drugs, Ltd.* court refused only to create a *broad* exception to *Noerr-Pennington* immunity for misrepresentations that did "not infect the core" of a claim. *Id.* at 123-24. Rather, it, too, affirmed the principal espoused by JPS that misrepresentations affecting the core of a case and judgment are objectively baseless and bar *Noerr-Pennington* immunity. *Id.* ("[a] *material* misrepresentation that affects the very core of a litigant's ... case will preclude *Noerr-Pennington* immunity")(emphasis in original), *citing Prof'l Real Estate Investors, Inc.*, generally

[4] Even assuming STR's interpretation of *Armstrong Surgical Ctr., Inc.* holding is correct, and based solely on the subject agency's (1) exhaustive determination, (2) awareness of a factual dispute, and (3) independent factual investigation, it still is inapposite. The court in *Armstrong Surgical Ctr., Inc.* distinguished two agency "fraud" cases on the basis that they depended on the antitrust defendants for the information on which they based their decisions. *Id.* at 164, n.8. Like those fraud cases, STR's false statements regarding the secrecy of its UF Process are material and were concealed from all involved – JPS and the Superior Court. And, all parties and the Superior Court relied upon STR's misinformation, which clearly could not be (because it was not) revealed by "public debate."

was for a purpose other than obtaining favorable government action. *Id.* at 158.[5]   Finally, no

Circuit Court has cited *Armstrong Surgical Ctr., Inc.* for the proposition STR advances; it has

been, and is, limited.[6]

### A.   The Additional Cases Cited By JPS Establish The Fraud/Illegitimacy Sham Exception To *Noerr-Pennington* Immunity

STR argues that cases predating *Prof'l Real Estate Investors, Inc.* and which involve non-

judicial proceedings are of no value in construing the fraud/illegitimacy sham exception.   STR

would turn *stare decisis* on its head.   The fact that courts predating *Prof'l Real Estate Investors,*

*Inc.* excused *Noerr-Pennington* immunity based on fraud or misrepresentations in other contexts

(actually including litigation) underscores the validity of the fraud/illegitimacy sham exception

and its First Amendment origins.   *See* JPS Opposition Brief, 9-10.   That is, to ensure meaningful

access to unadulterated decision-making and just adjudication, as articulated by the Supreme

Court.   *See Prof'l Real Estate Investors, Inc.*, 508 U.S. at 57.   Consequently, the

fraud/illegitimacy sham exception to *Noerr-Pennington* immunity is not a fringe or novel legal

principle as STR suggests, but a well-accepted and long-implemented one.

---

[5] Similarly, in *Kottle v. Northwestern Kidney Centers*, 146 F.3d 1056 (9th Cir. 1998), the Ninth Circuit held that vague allegations of fraud or otherwise immaterial misrepresentations are insufficient to trigger the fraud/illegitimacy sham exception, but sufficient allegations of misrepresentations that deprive a proceeding of its legitimacy are sufficient to preclude *Noerr-Pennington* immunity. *Id.* at 1063-64 (noting that antitrust plaintiff's complaint did not identify what representations were made, to whom, or what the improper actions or motivations were). *Kottle* reveals that JPS' detailed allegations regarding STR's fraud, its materiality, the parties involved, and its affect on the Superior Court Action and its judgment sufficiently trigger the fraud/illegitimacy sham exception

[6] In a rightful rebuke of the majority in *Armstrong Surgical Ctr., Inc.*, Senior District Judge Schwartz, in dissent, found that the "majority opinion conflicts with the teaching of this Court in [*Cheminor Drugs, Ltd.*], which held that under certain circumstances applicable here, material misrepresentations that affect the core of a litigant's submissions to an administrative body are not entitled to *Noerr-Pennington* immunity." *Id.* at 164 (Schwartz, J., dissenting). Judge Schwartz based his dissent on three grounds: (1) the misrepresentation exception to *Noerr-Pennington* is applied when intentional falsehoods pervade proceedings; (2) the majority's position that the misrepresentation exception has no place in Third Circuit jurisprudence is not supported by the case law; and (3) the majority's rationale is misplaced and limited; noting that the Fifth, Sixth, Ninth, and Eleventh Circuits, along with the District of Columbia, are in agreement that misrepresentations affecting the core of a proceeding bar *Noerr-Pennington* antitrust immunity. *Id.* at 166-68, 170-71 (Schwartz, J., dissenting). Judge Schwartz also recognized that the Supreme Court has "stated" multiple times that misrepresentations are not immunized when used in the adjudicatory process. *Id.* at 164 (Schwartz, J., dissenting), *citing, California Motor Transp. Co.*, 404 U.S. at 513; *Allied Tube & Conduit Corp. v. Indian head, Inc.*, 486 U.S. 492, 499-500 (1988).

**B.      Fraud/Illegitimacy Sham Exception Case Law Citing *Walker Process* Fraud
Properly And Separately Construes The Sham Exception**

STR misreads the fraud/illegitimacy sham exception cases in which patents are involved

or where *Walker Process Equip., Inc.* is cited.  They are not *Walker Process* fraud cases.  These

patent-related cases, did not (and could not) rely upon *Walker Process* fraud to defeat *Noerr-*

*Pennington* immunity against a *judgment* of an antitrust defendant obtained by fraud.[7]  Rather,

they rely upon fraud/illegitimacy sham principles to determine whether a party lacked "probable

cause" to defeat *Noerr-Pennington* immunity.  For example, *Hydranautics I*, like other, similar

cases cited in JPS' Opposition Brief,[8] invoked the fraud/illegitimacy sham litigation exception

independently, and not as a subsidiary of *Walker Process* fraud.  *Hydranautics v. FilmTec Corp.*,

70 F.3d 533 (9th Cir. 1995)("*Hydranautics I*").  That court applied the fraud/illegitimacy sham

exception alone to a patent infringement judgment on the basis that the antitrust defendant made

false statements before the courts.  *Id.* at 535.  Further, and contrary to JPS' construction of the

Federal Circuit's reversal in *FilmTec Corp. v. Hydranautics*, 982 F.2d 1546 (Fed. Cir. 1992), the

Federal Circuit held that the antitrust defendant's case "was not objectively baseless," which

caused the *Hydranautics I* court to conduct a sham litigation analysis regarding the antirust

defendant's probable cause in fraudulently pursuing its underlying infringement claims.  *Id.* at

538-39.

The *ex parte* decision-making process before the Patent and Trademark Office that STR

seeks to distinguish, therefore, was of no effect in *Hydranautics I* – only the antitrust defendant's

---

[7] *Walker Process Equip., Inc.* held that fraud in obtaining a patent is "sufficient to strip [the patent holder] of its exemption from the antitrust laws," while not addressing the effect of the enforcement of that fraudulently-obtained patent.  *Walker Process Equip., Inc.*, 382 U.S. at 174, 177
[8] *See, e.g., Boston Scientific Corp.*, 983 F. Supp. at 256, 272 (alleged fraud involved withholding of discovery and misrepresentations before the judiciary); *Nobelpharma A.B. v. Implant Innovations, Inc.*, 141 F.3d 1059, 1068 (Fed. Cir. 1998)(finding fraud/illegitimacy sham litigation exception and *Walker Process* fraud to "provide alternative legal grounds on which a patentee may be stripped of its immunity from antitrust laws; both legal theories may be applied to the same conduct.  ... Each provides its own basis for depriving a patent owner of immunity from antitrust laws; either or both may be applicable to a party's conduct in obtaining and enforcing a patent.").

"probable cause." Nor could it be. Immunity is destroyed in *Walker Process* fraud cases not because of the *ex parte*, administrative nature of patent prosecution, but because of the decision to withhold information despite the "uncompromising" duty of candor owed by the prosecuting party, akin to STR's duty of candor in the Superior Court Action. *See Beckman Instruments, Inc. v. Chemtronics, Inc.*, 439 F.2d 1369, 1379-81 (5th Cir. 1970). STR's distinction is a fiction. Regardless, at the very least, the cases cited by JPS serve to extend the principles set forth in *Walker Process Equip, Inc.* to the fraud/illegitimacy sham litigation exception to *Noerr-Pennington* immunity.[9]

**III.    This Court Is The Proper And Only Forum For Relief From STR's Sham Litigation In Furtherance Of Its Monopoly**

JPS does not seek relief in this Court from the Superior Court judgment or STR's fraud on the Court. The fundamental failing of STR's argument is that it ignores exactly what JPS is seeking relief from – STR's anticompetitive, monopolistic conduct under the Sherman Act. Specifically, (1) the sham State Court Action based on STR's *fraud, misconduct*, and other *inequitable* conduct as means to interfere with JPS' business relationships; and (2) STR's other anticompetitive conduct through the use of exclusive dealing contracts with its customers and suppliers, blocking JPS from purchasing publicly-available technologies to produce low-shrink EVA encapsulant, and disparaging JPS within the relevant market. AC, ¶¶ 85-142.[10]

---

[9] In setting in motion the fraud/illegitimacy sham exception, the Supreme Court cited to *Walker Process Equip., Inc.* as the basis for such an exception. *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 61 n.6. The First Circuit, in establishing that sham trade secret litigation violates the antitrust laws, also cited to *Walker Process Equip., Inc. CVD, Inc.*, 769 F.2d at 849-51. To the extent that the fraud/illegitimacy sham exception *is* an offshoot of *Walker Process* fraud, therefore, it in no way effects its application. Rather, it reinforces the validity of the exception, as the Supreme Court ruled, that the First Amendment narrowly protects only certain types of speech, not including fraud, misrepresentations, or the like, to ensure meaningful access to just adjudication and unadulterated decision-making. *See Prof'l Real Estate Investors, Inc.*, 508 U.S. at 57, 61 n.6.

[10] STR continues to improperly characterize this action as merely relitigating the Superior Court Action or a collateral attack on the Superior Court's judgment. To do this, STR ignores the very explicit premise of the Amended Complaint – STR's Sherman Act violations, among others. Any reference to the Superior Court Action and its fraud, concealment, and misrepresentation is because they are the means by which STR engaged in anticompetitive, monopolistic conduct to JPS' past, current, and future damage. *See, e.g.*, AC, Introductory

To be sure, STR's sham litigation damaged JPS before STR even received its illegitimate judgment. Partly because of this, at issue here is whether STR violated the antitrust laws – and not any issue relative to the errors of the Superior Court as its own, independent legal wrong. In any event, STR's anticompetitive actions, the antitrust legal issues, and JPS' antitrust injury are inquiries which the Superior Court cannot take up or provide relief from because of the exclusive federal jurisdiction over the Sherman Act. *See* 15 U.S.C. §§ 4, 15; *Gen. Inv. Co. v. Lake Shore & Mich. S. Ry. Co.*, 260 U.S. 261, 286-87 (1922); *Daley v. Town of New Durham, N.H.*, 733 F.2d 4, 6-7 (1st Cir. 1984)(because Sherman Act provides for exclusive jurisdiction in the federal courts, state court lacked subject matter jurisdiction; without subject matter jurisdiction, that court has no power to hear and decide the case). Quite literally, this Court offers the only avenue of relief to JPS for its antitrust injury and from STR's monopolistic conduct. *See* 17A–122 MOORE'S FEDERAL PRACTICE – Civil § 122.06[1] (2010)("The critical determination is whether the non-federal litigation will dispose of all claims raised in the federal action.")(citations omitted). *Cf. Baltimore Scrap Corp.*, 237 F.3d at 402-04 (where state judgment is not procured by fraud or deceit, it cannot fall within any fraud exception to *Noerr-Pennington*, and relief for such action, then, is better suited within the underlying litigating court). Further, even if it could, the State Court ruled long before JPS learned of STR's sham litigation – in the post-judgment phase – that issues germane to STR's sham litigation could not be litigated or subjected to discovery. *See* JPS Opposition Brief, nn.15-16. And, even if the Superior Court did reverse its judgment for STR, JPS still has been (and will be) damaged by STR's sham litigation and other

---

Paragraph; "Nature of Action;" ¶¶ 28-41 (alleging barriers to entry and STR's market dominance); 54, 55-56, 70-73 (sham litigation to inflict antitrust injury); 74-85 (anticompetitive market & commercial dealings); 85-93 (First Claim For Relief - "Sham Litigation To Monopolize"); 94-103 (Second Claim For Relief - "Sham Litigation To Attempt To Monopolize"); 104-114 (Third Claim For Relief - "Overall Scheme To Monopolize"), 115-126 (Fourth Claim For Relief - "Overall Scheme To Attempt To Monopolize"). Indeed, as the Supreme Court held in *Prof'l Real Estate Investors, Inc.*, the injurious conduct in sham litigation is that which comes from the "use [of] the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon." *Prof'l Real Estate Investors, Inc.*, 508 U.S. at 60-61.

anticompetitive conduct – no resolution on those issues can ever be reached by the Superior Court. *City of Springfield, Mass. v. Comcast Cable Communications, Inc.*, 670 F.Supp.2d 100, 107 (D. Mass. 2009)(deference to state court appropriate where "a complete remedy" is possible in that court).   JPS would still be in its current situation – prosecuting before this Court its Sherman Act claims.   Consequently, JPS' claims stemming from its antitrust harm must properly remain before this, and only this, Court.

## IV.   JPS' Detailed Fact-Based Pleading More Than Sufficiently Alleges Plausible Grounds That STR Engaged In Actionable Antitrust Conduct

Dismissing virtually the entirety of its sham litigation conduct (*e.g.*, concealment and misrepresentations of key evidence and testimony), STR improperly, and only, attacks the weight and merit of JPS' detailed factual allegations concerning its fraudulent, sham actions. STR disregards the well-accepted motion to dismiss standard in favor of what is a closing argument.   Going well beyond its four corners, STR would have the Court analyze the Amended Complaint as if it were all the "evidence of fraud" JPS has, and to actually weigh such "evidence" to "see that it is far from as described."   STR Reply Brief, 11.[11]   It is axiomatic,

---

[11] Specifically, STR attacks two allegations – the [REDACTED] and Macro's conduct in marketing the UF Process publicly.   Regarding the [REDACTED] on the one hand, STR argues that "JPS has, at best, employed a strained interpretation of [REDACTED] and, at worst, deliberately mischaracterized [REDACTED]" STR Reply Brief, 13, and, on the other hand, claims that [REDACTED] demonstrates that STR was diligently protecting its trade secrets."   STR Reply Brief, 14.   While not at issue at this stage, but given STR's admission, JPS' allegation regarding [REDACTED] quite clearly is more than sufficient to withstand STR's weighing of the "evidence" in comparison to its version of the evidence.   Regardless, the inquiry, again, is not whether there are no triable issues of fact, as STR posits, but simply whether JPS has sufficiently alleged facts to state plausible grounds for relief and permit an expectation that discovery will reveal evidence supportive of such facts.   *Twombly*, 550 U.S. at 555-56.   The very existence of STR's dispute on the merits of [REDACTED] highlights that JPS has more than met the plausibility requirement.   Regarding Macro, the Superior Court never fully considered, reviewed, or was presented with evidence regarding it or STR's fraud and illegitimate litigation conduct.   *See* Opposition Brief, nn.15-16.   *See In re Relafen Antitrust Litig.*, 360 F.Supp.2d at 179-80 (when facts regarding probable cause not decided in prior lawsuit are in dispute, "it becomes the duty of the trial court to submit the question to the jury.").   Despite STR's strained interpretation of the Superior Court's Orders, it only ruled procedurally that discovery shall not be permitted regarding Macro due to its prior rulings precluding same (*e.g.*, "discovery previously denied") and the fact the case was in its damages phase.   *See* Opposition Brief, nn.15-16.   Of course, JPS found itself in just such a position because of STR's fraud and concealment of material information relative the very existence of its putative trade secret.   Ultimately, the Superior Court did not consider that which JPS presents to and seeks from this Court – remedies for antitrust harm and from STR's sham litigation.

however, that the motion to dismiss standard focuses solely on the sufficiency of the *allegations*, which are considered "on the assumption that [they] … are true (even if doubtful in fact) …." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). *See Lesiege v. Town of Sturbridge*, No. 09-30044-MAP, 2010 WL 1663991 (D. Mass. Mar. 24, 2010)("[i]t is axiomatic that … the court must accept the facts as set forth in the complaint and view them in the light most favorable to the plaintiff."). A court also must "neither weigh[ ] the evidence nor rule[ ] on the merits because the issue is not whether the plaintiffs will ultimately prevail, but whether they are entitled to offer evidence to support their claims." *Moorer v. Dep't of Soc. Services*, No. 08-11584-MLW, 2010 WL 3258607 (D. Mass. Aug. 16, 2010)(alterations in original), *citing, Day v. Fallon Cmty. Health Plan, Inc.*, 917 F.Supp. 72, 75 (D. Mass. 1996). At best, STR impermissibly conflates the motion to dismiss standard with that for summary judgment. *E.I. DuPont De Nemours and Co. v. Kolon Indus.*, 688 F.Supp.2d 443, 459 (E.D. Va. 2009)(*Twombly* did not elevate that pleading standard to something akin to a summary judgment standard).

In light of the specificity and detail of the Amended Complaint regarding STR's sham conduct, including fraud, *see* AC, ¶¶ 43-73, under *Tombly* and *Ashcroft v. Iqbal*, 556 U.S. ___, 129 S. Ct. 1937, 1950 (2009), it more than plausibly alleged that STR, as a reasonable litigant, could not have expected success on the merits, but for its detailed fraud and other misconduct, *i.e.*, it claim was objectively baseless. *See CVD, Inc.*, 769 F.2d at 851. JPS, therefore, has sufficiently alleged that STR is not entitled to *Noerr-Pennington* immunity.

**V.     JPS Has Adequately Pled The Existence Of The Standing Element Known As "Antitrust Injury"**

The First Circuit in *RSA Media, Inc. v. AK Media Group, Inc.*, 260 F.3d 10 (1st Cir. 2001), defined the standing test of "antitrust injury" as "'injury of the type the antitrust law were intended to prevent and that *flows from that which makes the defendants' acts unlawful*' … [t]he

plaintiff must prove that the injury is 'the *type* of loss that the claimed violations ... would be likely to cause.'" *Id.* at 14 (first emphasis in original; second emphasis added); *Morales-Villalobos v. Garcia-Llorens*, 316 F.3d 51, 55 (1st Cir. 2003)(the court assessed whether the injury to the plaintiff "would not be of the *kind* that antitrust laws are intended to address.")(emphasis added).  The standing inquiry of antitrust injury is not to be confused with the question of a substantive violation of antitrust law. In *SAS of Puerto Rico v. Puerto Rico Telephone Co.*, 48 F.3d 39, 43-44 (1st Cir. 1995), the First Circuit ruled:

> [C]ourts sometimes have difficulty ... in separating standing or antitrust injury issues from  ... whether there has been an antitrust injury at all, and whether the plaintiff has suffered any injury causally (in the 'but for' sense) related to the challenged conduct.  Standing or antitrust injury involves a different concept: even where a violation exists and the plaintiff has been damaged by it, the courts – for reasons of prudence – have sought to limit the right of private parties to sue for damages or injunctions.  The prudential concerns, however, are multiple, and the variety of situations endless ....  Another set [of limitations] reflects an unwillingness to award antitrust damages to one who suffered from pro-competitive or irrelevant effects of an otherwise anticompetitive transaction.[12]

Thus, the standing inquiry of antitrust injury is not met where the injury suffered by the plaintiff is of the *type* or *kind* that would flow from pro-competitive conduct.  *Accord Morales-Villalobos*, 316 F.3d at 55 (the most common use of antitrust standing is to bar claims based on injuries to plaintiff that "result[] from what closer analysis reveals to be a pro-competitive transaction.").  And, the correct antitrust injury analysis is to assume that a violation has occurred, and then to ask whether the type of injury the plaintiff alleged is the type or kind of injury that would flow from the stated antitrust violation.  II P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 335f, "To Test Standing, Assume A Violation"); *Morales-Villalobos*, 316

---

[12] *Accord*, II P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 335f, 297 (2000 ed.)(courts frequently confuse the standing question of antitrust injury with the question of no substantive antitrust violation); *Doctor's Hosp. of Jefferson, Inc. v. Southeast Medical Alliance, Inc.*, 123 F. 3d 301, 305 (5th Cir. 1997)("Since 1983, we have pointed out a distinction between antitrust injury and injury to competition, the latter of which is often a component of substantive liability ... antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition.").

F.3d at 55 (court first assumed there was an exclusive dealing and group boycott violation and then assessed whether "the injury to [plaintiff] would not be of the kind the antitrust laws are intended to address").

Moreover, antitrust standing/antitrust injury is more likely to exist where the plaintiff is a "presumptively favored" plaintiff, such as a "competitor" of the defendant "who seeks to serve that [same] market" as the defendant. *SAS of Puerto Rico*, 48 F.3d at 44. *See Arroyo-Melecio v. Puerto Rican Am. Ins. Co.*, 398 F.3d 56, 72 (1st Cir. 2005)(court denied motion to dismiss since plaintiffs as "consumers" were "presumptively favored as appropriate plaintiffs to assert antitrust injury").[13]

In addition, the rule in the First Circuit in making the antitrust injury assessment is to deny a motion to dismiss claiming lack of antitrust injury as long as there is "no obvious reason why," if the claimed anticompetitive conduct amounted to a violation, that "the injury would not be of the kind the antitrust laws are intended to address." *Morales-Villalobos*, 316 F.3d at 55.

Here, JPS alleges that it was a direct competitor of STR's and the direct target of the sham litigation against it, and the exclusive contracts were targeted to and did limit the ability of JPS and other "new entrants" to penetrate the market. AC, ¶¶ 1-2, 42, 43-74, 79-84. Therefore, JPS's injuries, namely, exclusion from selling to a market, are of the type or kind the antitrust laws were intended to prevent, and JPS' injuries, that is, the exclusion, flowed directly from and as a consequence of the claimed antitrust violations, namely, the sham litigation and the exclusive contracts. *See id.* Thus, there is no obvious reason why, assuming the pled anticompetitive conduct amounts to a violation, that JPS' injuries would not be of the type or

---

[13] Competitors and consumers are presumptively favored plaintiffs to assert antitrust injury because they are the "targets" of anticompetitive conduct, and their injuries are likely to be of the type or kind that flow from the anticompetitive conduct. *Id.* (status as "target" sufficient but not necessary); *Ivision Inter. of Puerto Rico, Inc. v. Davila-Garcia*, 364 F.Supp.2d 166, 171 (D. P.R. 2005)( "direct target").

kind that antitrust laws are intended to address. *Id.* JPS' allegations plausibly satisfy the antitrust injury standard. *See RSA Media, Inc.*, 260 F.3d at 14.

Ultimately, STR's argument that JPS did not sufficiently plead antitrust injury because JPS did not sufficiently plead injury to competition is simply irrelevant to the standing question of whether JPS' alleged injuries are of the type or kind that would flow from the anticompetitive conduct.[14]

---

[14] Instead, injury to competition is part of the substantive showing the plaintiff must make that the defendant has used anticompetitive conduct to maintain or increase its monopoly power. *SMS Systems Maintenance Servs., Inc. v. Digital Equipment Corp.*, 188 F.3d 11, 15 (1st Cir. 1999)("To prove a violation of Section 2 of the Sherman Act, the plaintiff must show both that the defendant has monopoly power in a relevant market and that it has maintained or increased that power through anticompetitive conduct."); *Sullivan v. National Football League*, 34 F.3d 1091, 1096-97 (1st Cir. 1994)("Anticompetitive effects [are] more commonly referred to as 'injury to competition' or 'harm to the competitive process'"). Injury to competition, as part of a substantive antitrust claim, is shown by conduct that "obstructs the achievement of competition's basic goals – lower prices, better products, and more efficient production methods." *Town of Concord v. Boston Edison Co.*, 915 F.2d 17, 21-22 (1st Cir. 1990). And, STR has not made the argument, in either its motion to dismiss or in its reply, that JPS has failed to plead or provide inferences supporting a plausible showing of injury to competition as part of its substantive antitrust claims. Moreover, the "vast majority of cases" frequently cited with respect to whether exclusionary contracts have anticompetitive effects were decided at the summary judgment stage and "after the record had been fully developed." *See E.I. DuPont De Nemours and Co.*, 688 F. Supp.2d at 459. In any event, JPS has pled that STR has extremely high market shares (AC, ¶¶ 31, 35, 37), that there are high barriers to entry (AC, ¶¶ 29-33), that STR engaged in sham litigation to eliminate or delay the entry of JPS as a competitor (AC, ¶¶ 43-73), that STR had exclusive contracts with a high percentage of its customers and that such contracts harmed JPS as well as potential "new entrants" (AC, ¶¶ 74, and 30-31, 42, 83-84), that JPS had "a number of [extrusion] lines of EVA photovoltaic encapsulant for use in solar modules" and the inference is therefore that JPS was a significant competitor of STR's (AC, ¶ 1), that the shares of the other remaining competitors are the inverse of STR's 80%-90% share and are small (AC, ¶ 31, 35. 37, 38), that they have "limited or no capacity to expand production" (AC, ¶ 38), and that demand is increasing while STR is not able to meet all of the demand (AC, ¶ 39). JPS also pled that "[t]he price of JPS' low-shrink EVA encapsulant, which is equal in quality, was substantially less than STR's average price per square meter," and that STR's "reputation in the photovoltaic industry for service was and is regarded by many as poor", with the inference that JPS' service was superior. AC, ¶ 40. As a result, JPS pled that "STR's unlawful conduct has injured competition for the sale of low-shrink EVA encapsulants in the United Stated and international markets." AC, ¶ 82. JPS is prepared to plead expressly, by way of an amendment, facts supporting the conclusion that it was a significant competitor of STR's, that it was adding significant new capacity to compete with STR at the time the injunction against it issued in the Superior Court Action, and that its service in the industry was regarded as superior to STR's. Courts have already held that an antitrust violation can be shown by "bringing baseless litigation intended to delay entry into a market by a competitor," *United States v. Richard Roe,* 168 F.3d 69, 72 (2nd Cir. 1999), and by use of "an exclusive dealing agreement [that] . . . is likely to keep at least one significant competitor of the defendant from doing business in a relevant market." *Eastern Food Servs., Inc. v. Pontifical University Servs. Assoc., Inc.*, 357 F.3d 1, 8 n. 4 (1st Cir. 2004), *citing, Roland Machinery Co. v. Dresser Indus,, Inc.*, 749 F.2d 380, 394 (7th Cir. 1984); *LePage's Inc v. 3M*, 324 F.3d 141, 159 (3rd Cir. 2003)("even the foreclosure of 'one significant competitor' from the market may lead to higher prices and reduced output."). Also, the allegations that demand is increasing, which STR cannot meet, and neither can the remaining small competitors, support the conclusion that STR is charging supracompetitive prices. IIA P. Areeda & H. Hovenkamp, ANTITRUST LAW, ¶ 501, p. 85 (1995 ed.) ("With strong demand for the product and no significant rivals, the defendant can reap supracompetitive prices and profits").

## VI.   JPS' Claims Meet Applicable Pleading Standards

### A.   JPS Has Adequately Pled Monopolization Of A Relevant Market

STR argues that JPS has failed adequately to plead monopolization of a relevant product market since the "*only factual allegations* in support of this relevant [low-shrink EVA market] demonstrate that 'low-shrink' wrap EVA encapsulant is a *superior* EVA encapsulant product ...." STR Principal Brief, 29 (emphasis added).   Abandoning its first position, STR now says in its reply that "JPS' attempt to narrowly define the market as 'low-shrink' EVA encapsulant fails as the FAC *only shows* that 'low-shrink' EVA encapsulants are *preferred* over other encapsulants ...." STR Reply Brief, 20 (emphasis in original).   The juxtaposition of STR's shifting arguments on the product market issue obviously shows that both are false – since both cannot logically be true.   However, out of STR's continued blatantly false representations of what JPS actually pled shines the truth: that JPS at least pled in support of a low-shrink EVA product market that low-shrink was both *superior* to and *preferred* over other products.   And, superiority and preference are two of the factors or "practical indicia" recognized in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) as supporting a determination of a relevant product market.   JPS' Opposition Brief, 26.   JPS pled most or all of these factors, and, therefore, has plausibly shown a relevant product market.[15]   JPS Opposition Brief, 26-29.

### B.   JPS Has Met Pleading Standards Under The Lanham Act

STR in its reply abandons most of the arguments contained in its motion to dismiss against JPS' claim under the Lanham Act, but now argues that all JPS has shown is a "'single, discrete misrepresentation to one potential customer.'" STR Reply Brief, 24.   As JPS explains in

---

Thus, JPS, as a matter of its substantive antitrust claims, has sufficiently pled facts showing plausible injury to competition and can plead additional facts further plausibly showing injury to competition.
[15] *E.I. DuPont De Nemours and Co.*, 688 F.Supp.2d at 459 (where defendant moving for dismissal of plaintiff's antitrust claim focused on claimed "factual omissions" from plaintiff's pleading, the Court denied the motion holding that "DuPont has failed to address the *substance* of Kolon's claim")(emphasis added.)

its Opposition, 38, it could not refer directly in the Amended Complaint, at 77, to the email from

[REDACTED]

or to the language [REDACTED]

[REDACTED] because STR marked it as confidential.  However, JPS meant by the phrase "similar

communications" in paragraph 77 that STR had sent similar [REDACTED] using the same or similar

language to many other "customers" and "potential customers" of JPS, and "within the industry

generally."  AC, ¶ 77.[16]  STR, in its reply, ignores JPS' explanation that paragraph 77 refers to

similar communications to many parties in the form and language of the [REDACTED].  This

explanation of paragraph 77 moots STR's arguments that JPS has not shown "advertising or

promotion" within the Lanham Act.  As JPS explained in its Opposition, 40-41, in a very small

industry comprised of very few purchasers, as is the industry of solar module manufacturers

here, communications to several major purchasers certainly meets the Lanham Act standard, and

even one communication to one purchaser may be sufficient.[17]

## VII.   Conclusion

For the foregoing reasons, and those set forth in JPS' Memorandum of Law in Opposition

to Defendant's Motion to Dismiss, STR's Motion to Dismiss First Amended Complaint or in The

Alternative for a Stay should be denied.

---

[16] JPS is prepared to restate this paragraph, by way of amendment, as directly referring to the same or similar
language and form of communication of the [REDACTED] although JPS may first have to strike the
"confidential" designation from the [REDACTED]
[17] STR continues to argue in its Reply Brief, 24-26 & n.20, that the presence of a statement of STR's legal position
in the [REDACTED] immunizes the portion of the [REDACTED] making a verifiable statement of fact.  STR is wrong;
once there is a verifiable statement of fact in a communication that is colorably false, even if accompanied by
opinion, the matter is for the jury.  *Fuente Cigar, Ltd. v. Opus One*, 985 F.Supp.2d 1448, 1457 (M.D. Fla. 1997)
("Nonetheless, to preface defamation with a phrase like 'In my View,' or 'In our opinion,' does not afford it a
talismanic immunity ....  In particular, mixed expression of opinion (as opposed to 'pure opinion') is not
constitutionally protected.  ...  When Opus One's representative stated that ... Fuente had 'appropriated' Opus
One's mark, that individual was relating an opinion based on facts ....").

Dated: December 20, 2010

Respectfully submitted,

JPS ELASTOMERICS CORP.
By its attorneys,


/s/ Michael C. Gilleran
Michael C. Gilleran | BBO No. 192210
Adam M. Weisberger | BBO No. 646844
Brian R. Birke | BBO No. 652720
ADLER POLLOCK & SHEEHAN P.C.
mgilleran@apslaw.com
aweisberger@apslaw.com
bbirke@apslaw.com
175 Federal Street
Boston, MA  02110
T: 617.482.0600
F: 617.482.0604

CERTIFICATE OF SERVICE

I, Michael C. Gilleran, hereby certify that this document
filed through the ECF system will be served electronically
to the registered participants as identified on the Notice of
Electronic Filing [NEF] and paper copies will be served via
First-Class U.S. Mail to those indicated as non-registered
participants on December 20, 2010.

Dated: December 20, 2010      /s/ Michael C. Gilleran
                              Michael C. Gilleran